**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**TERRY LEE KENNEY,**

|                                     |                                     |
| ----------------------------------- | ----------------------------------- |
| Plaintiff**,**                      |                                     |
| **v.**                              | **CIVIL ACTION NO.: 3:15-CV-00003 (GROH)** |
| **CAROLYN W. COLVIN,** **Acting Commissioner of Social Security,** | |
| Defendant.                          |                                     |

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On January 14, 2015, Plaintiff Terry Lee Kenney ("Plaintiff"), through counsel Michael Miskowiec, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On March 26, 2015, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 7; Admin. R., ECF No. 8). On April 27, 2015, and May 26, 2015, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13). The matter has now been referred to the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge. 28 U.S.C. § 636(b)(1)(B)

(2009); Fed. R. Civ. P. 72(b). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On May 24, 2010, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB"), alleging disability that began on April 23, 2010. (R. 297, 301). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 31, 2014; therefore, Plaintiff must establish disability on or before this date. (R. 66-67). Plaintiff's claim was initially denied on September 8, 2010, and denied again upon reconsideration on December 13, 2010. (R. 192, 197). On January 25, 2011, Plaintiff filed a written request for a hearing (see R. 200-02), which was held before United States Administrative Law Judge ("ALJ") Daniel F. Cusick on February 28, 2012. (R. 86). On March 28, 2012, ALJ Cusick issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 166-84). On February 4, 2013, the Appeals Council vacated ALJ Cusick's decision and remanded the case for further proceedings. (R. 186).

On June 26, 2013, upon remand, a hearing was held before ALJ Karen B. Kostol in Morgantown, West Virginia. (R. 126). Plaintiff, represented by counsel Katrina Christ, Esq., appeared and testified, as did Larry Bell, an impartial vocational expert. (Id.). On August 2, 2013, ALJ Kostol issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 63-75). On

November 13, 2014, the Appeals Council denied Plaintiff's request for review, making ALJ Kostol's decision the final decision of the Commissioner. (R. 3).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on July 25, 1969, and was forty years old at the time he filed his claim for DIB. (R. 297). He completed the ninth grade and never obtained his GED or received any specialized, trade or vocational training. (R. 96, 134-35, 341). Plaintiff's prior work experience includes working as a window frame assembler, cable wirer and glass grinder and packer. (R. 158). He is married and resides with his wife, twenty-two-year-old daughter and three-year-old granddaughter. (R. 133-34).

### B. Relevant Medical Evidence

#### 1. Medical History

Plaintiff alleges disability due to the following impairments: (1) lumbar disc disease with disc herniation and left leg radiculopathy; (2) degenerative disc disease of the cervical and thoracic spine with focal disc herniation; (3) obesity; (4) asthma; (5) anxiety disorder; (6) perirectal abscess and (7) carpal tunnel syndrome. (Pl.'s Mem. in Supp. of Mot. for Summ. J. at ("Pl.'s Br.") 8-9, ECF No. 12). The medical history of each impairment will be discussed in turn.

##### a. Lumbar Disc Disease, Degenerative Disc Disease and Left Leg Radiculopathy

In 2004, Plaintiff experienced back pain that radiated to his left leg and was diagnosed with "osteoarthritis [of his spine] with herniated nucleus pulposus." (R. 441). On May 11, 2004, James D. Weinstein, M.D., performed a lumbar hemilaminotomy and micro-fasciotomy on Plaintiff. (R. 514). During the surgery, Dr. Weinstein found a

"hard[,] calcified element" that was interfering with Plaintiff's nerve root that "could not be safely removed." (Id.). Subsequently, Plaintiff was diagnosed with "failed back surgery syndrome" and continued to experience back and left leg pain. (See R. 441, 617).

On April 24, 2007, Plaintiff underwent surgery to implant a spinal cord stimulator to treat his back pain. (R. 616). The spinal cord stimulator remained implanted for a trial period of one week, after which it was removed. (R. 617). Plaintiff experienced a good response to the trial stimulation, reporting significant relief of his left leg pain. (Id.). He was considered a "good candidate to undergo a [permanent] spinal cord stimulation implant." (Id.). For reasons unknown, a permanent spinal cord stimulation implant was never effectuated.

On July 23, 2007, Plaintiff started receiving treatment from a primary care physician, Mazen Nashed, M.D., of Associated Specialists, Inc. (R. 441). After examining Plaintiff, Dr. Nashed documented that Plaintiff's back pain was stemming from the S5-S1 vertebrae. (Id.). Dr. Nashed prescribed Voltaren and Tylenol #3 to treat Plaintiff's pain, as well as Skelaxin, a muscle relaxant. (R. 436). Dr. Nashed further noted that Plaintiff chewed tobacco. (R. 441). Dr. Nashed advised that Plaintiff "quit chewing tobacco completely." (R. 436).

On August 20, 2007, Dr. Nashed diagnosed Plaintiff with neuropathy after noting that Plaintiff did not experience sensations appropriately in his legs. (R. 442). Dr. Nashed noted that Plaintiff's neuropathy was more severe in his left leg than his right. (Id.). Dr. Nashed reported that he was considering prescribing Lyrica to treat Plaintiff's

neuropathic pain. (See id.). A few weeks later, Lyrica was prescribed, which "improve[d]" Plaintiff's neuropathy. (R. 432, 434, 475).

Initially, Plaintiff reported that his pain medication regimen was effective. (See R. 442). However, on August 25, 2009, Plaintiff complained of "acute over chronic back pain . . . with left radiculopathy." (R. 430). Dr. Nashed ordered an MRI, which was performed on August 31, 2009. (R. 497). The results of the MRI were compared with an MRI taken before Plaintiff's hemilaminotomy. (Id.). The comparison revealed "[p]ostsurgical changes and degenerative changes" as well as "[l]eft [L5-S1] exit foramen narrowing which is severe and similar to prior exam." (Id.). Subsequently, Dr. Nashed added "[d]egenerative spine disease" to Plaintiff's list of diagnoses. (R. 445).

In the months following the MRI, Dr. Nashed explored various pain medication regimens, attempting to find effective medications that would accommodate Plaintiff's financial limitations. (R. 445, 449). On September 3, 2009, Dr. Nashed noted that Plaintiff continued to experience pain during position changes but was able to walk without assistance. (R. 449). That same day, Dr. Nashed referred Plaintiff to Todd Harshbarger, M.D., of the West Virginia University Department of Neurosurgery, who reported that he was "not recommending surgery at this point in time." (R. 389-90).

On November 11, 2009, Plaintiff presented to Dr. Nashed's office for a scheduled appointment. (R. 445). During the appointment, Dr. Nashed ordered an arterial doppler of Plaintiff's legs, which showed intermittent claudication of both legs. (R. 440). Dr. Nashed also documented that Plaintiff chewed tobacco, although he added "cigarette smoking" to Plaintiff's list of diagnoses. (R. 445). Finally, Dr. Nashed reviewed Dr. Harshbarger's report and suggested that Plaintiff apply for DIB. (R. 445).

On April 7, 2010, Plaintiff presented to the emergency room at United Hospital Center ("UHC"), complaining of injuries from a fall that he sustained while working for Simonton Building Products, Inc. ("Simonton"). (R. 398, 402). Plaintiff reported that he fell from a standing position, injuring his right elbow and wrist. (R. 402). X-rays were taken, the results of which were normal. (See R. 399, 404). Consequently, Plaintiff was diagnosed with a contusion. (R. 407). On April 23, 2010, Plaintiff stopped working for Simonton. (R. 301). The following day, he filed an application for DIB. (R. 297).

On April 27, 2010, Plaintiff appeared for a scheduled appointment with Dr. Nashed. (R. 464). Dr. Nashed reported that Plaintiff was "doing fine" with the prescribed pain medication but that he was "switch[ing] . . . Voltaren to Mobic . . . for better compliance." (Id.). Dr. Nashed further reported that Plaintiff denied having any radiculopathy and updated Plaintiff's diagnosis of radiculopathy and neuropathy to "stable." (Id.). Finally, Dr. Nashed reported that he again "encouraged [Plaintiff] to lose weight and quit smoking" and listed "[c]igarette smoking" under Plaintiff's list of diagnoses. (Id.).

On January 3, 2012,[1] Plaintiff presented as a new patient to Health Access Free Clinic, Inc. (R. 706-07). During this visit, Rose Clark, a Certified Family Nurse Practitioner ("CFNP Clark"), began treating Plaintiff as a primary care provider. (See id.). CFNP Clark diagnosed Plaintiff with chronic low back pain. (R. 707). She noted that Plaintiff walked with a cane, was overweight and chewed tobacco. (R. 706). She also noted that Plaintiff was prescribed hydrocodone by Dr. Nashed for his pain. (See id.).

On January 10, 2012, Plaintiff presented to the emergency room at UHC, complaining of severe back pain. (R. 481-84). Plaintiff stated that he was "[o]ut of

---

[1] No medical records were submitted for the year of 2011.

Lortabs," his pain medication. (R. 482). Plaintiff was given a ketorolac injection, which was documented as effective. (R. 483-84). Afterwards, Plaintiff was discharged and drove himself home. (R. 484).

Over the following months, CFNP Clark continued to provide routine care to Plaintiff. (See R. 572-89, 639-40). On July 10, 2012, CFNP Clark ordered that an MRI be performed on the lumbar, thoracic and cervical sections of Plaintiff's spine. (R. 527-32). The MRI of Plaintiff's cervical spine showed "lateral recess impingement" that could potentially cause neural foraminal narrowing. (R. 531-32). The MRI of the thoracic spine showed "[f]ocal disc herniation . . . with resulting neuroforaminal and central canal stenosis." (R. 529). Finally, the MRI of Plaintiff's lumbar spine showed "[p]ostsurgical changes and degenerative changes" and "neural foraminal stenosis." (R. 527-28). When the MRI of Plaintiff's lumbar spine was compared with the MRI that was taken on August 31, 2009, the findings were noted to be "similar." (R. 528).

Plaintiff presented to the emergency room at UHC several times in the following months. On September 21, 2012, Plaintiff presented to the emergency room complaining of severe back pain. (R. 522-26). Plaintiff was noted to have used a heating pad at home that "blistered his lower back." (R. 540). Plaintiff was diagnosed with chronic pain exacerbation and given injections of solumedrol and ketorolac. (R. 524-25). On September 25, 2012, Plaintiff returned to the emergency room, complaining of severe back pain. (R. 554-62). Plaintiff was given hydromorphone for his pain. (R. 559). On November 17, 2012, Plaintiff again presented to the emergency room with complaints of back pain. (R. 591-95). Plaintiff was given Lortab and discharged home. (R. 594-95).

On November 27, 2012, Plaintiff received a consultation from the West Virginia University Hospitals' Spine Center ("WVUH Spine Center"), per CFNP Clark's request. (R. 622-23). During the consultation, Dr. Charles L. Rosen, M.D., reviewed Plaintiff's most recent MRIs and "recommended conservative treatment." (R. 623). Another physician, J. David Lynch, M.D., recommended that CFNP Clark "maximiz[e] gabapentin" for pain control. (Id.). Dr. Lynch also encouraged Plaintiff to lose weight, begin physical therapy sessions and "[c]ontinue tobacco cessation." (Id.). Plaintiff declined the physical therapy consult "due to the [cost of] gas." (R. 635).

Until September 2013, Plaintiff sought only routine care from CFNP Clark. (See R. 690-91). However, in September, Plaintiff reported that his pain had been "worse recently." (R. 689). On September 2, 2013, Plaintiff presented to the emergency room at UHC with complaints of back pain. (R. 668-73). Plaintiff, who was noted to chew tobacco, was given injections of fentanyl citrate and solumedrol and discharged home. (R. 670-72). Three days later Plaintiff returned to the emergency room with the same complaint of back pain. (R. 656-60). Plaintiff was given ketorolac and celestone soluspan injections before being discharged home. (R. 659-60). On September 11, 2012, CFNP Clark noted that Plaintiff had run "[o]ut of [M]obic." (R. 689).

**b. Obesity**

On July 23, 2007, Dr. Nashed diagnosed Plaintiff with obesity. (R. 441). On this date, Plaintiff's weight was recorded as 270 pounds. (Id.) Throughout the following years, Plaintiff was advised by several physicians to lose weight, including Dr. Nashed and Dr. Lynch from the WVUH Spine Center. (See R. 429, 623). Plaintiff's weight, however, remained fairly consistent. (See R. 429, 689, 706). For example, on April 27,

2010, Dr. Nashed noted that Plaintiff's weight was 278 pounds. (R. 429). Subsequently, on January 3, 2012, and September 11, 2013, CFNP Clark noted that Plaintiff's weight was 285 pounds and 275 pounds, respectively. (R. 689, 706).

### c. Asthma

On September 9, 2008, Plaintiff informed Dr. Nashed that he had a "history of pulmonary asthma." (R. 433). Dr. Nashed ordered that a pulmonary function test be performed, the results of which were "consistent with obstructive airway disease." (R. 433). Dr. Nashed diagnosed Plaintiff with asthma and prescribed albuterol, an inhaler. (Id.).

On October 23, 2007, Dr. Nashed noted that Plaintiff had "many red flags" for sleep apnea. (R. 435). Dr. Nashed instructed Plaintiff to keep a sleep log and to record how drowsy he felt during the day. (R. 435). The sleep log showed hypersomnia during the day, multiple awakenings at night, poor quality of sleep and poor sleep efficiency. (Id.). Dr. Nashed ordered that a sleep study be conducted, which confirmed the diagnosis of sleep apnea. (R. 433). However, because Plaintiff's sleep apnea was not severe enough, Plaintiff did not qualify for a continuous positive airway pressure ("CPAP") machine. (R. 431, 433). Instead, Dr. Nashed noted that Plaintiff's sleep apnea required only conservative treatment. (See id.). A pulmonary function test conducted on August 11, 2010 showed no abnormal results. (R. 452).

### d. Anxiety

On June 8, 2009, Plaintiff presented to Dr. Nashed for a scheduled visit. (R. 431). During the visit, Dr. Nashed noted that Plaintiff was "quite anxious." (Id.). Dr. Nashed prescribed Xanax and subsequently added "[a]nxiety disorders" to Plaintiff's list of

diagnoses. (R. 430-31). On January 3, 2012, CFNP Clark noted that Plaintiff was taking citalopram instead of Xanax. (See R. 706). CFNP Clark further noted that Plaintiff was alert and oriented and had a normal mental status. (Id.).

### e. Perirectal Abscess

On September 5, 2007, Victor Villarreal, M.D., diagnosed Plaintiff with an anal fistula. (R. 501). Dr. Villarreal performed an anal fistula plug, which Plaintiff tolerated well. (Id.). About a month later, on June 19, 2007, Dr. Villarreal performed a fistulotomy, which Plaintiff also tolerated well. (R. 503). No complications from either surgery were noted. (R. 501, 503).

On September 25, 2012, Plaintiff presented to the emergency room at UHC with complaints of perirectal pain. (R. 519). A physical examination revealed that a perirectal abscess had developed at Plaintiff's former fistulotomy site. (Id.). The abscess "had tunneled to [Plaintiff's] intestines." (R. 564). Plaintiff was sent to surgery where Jeffrey W. Madden, M.D., inserted a drain into the abscess. (R. 517-18). Afterwards, Plaintiff reported that his pain was "much improved." (R. 544). Plaintiff was prescribed Lortab for pain control. (Id.). The drain was removed on October 8, 2012. (R. 571).

On October 17, 2012, Plaintiff returned to the emergency room, complaining that his abscess had opened and was draining "bowel, blood and pus." (R. 564). A computerized tomography ("CT") scan of Plaintiff's pelvis was performed, showing possible "postsurgical or residual inflammatory change[s] [but] [n]o drainable abscess." (R. 567). Plaintiff was informed that the abscess should heal on its own. (See R. 539).

### f. Carpal Tunnel Syndrome

In 2002, Matthew P. Darmelio, M.D., performed carpal tunnel surgery on both of Plaintiff's upper extremities. (R. 441). The surgery was successful, allowing Plaintiff to frequently use his hands without pain. (See R. 441, 444). However, on April 18, 2008, Plaintiff complained to Dr. Nashed that he was experiencing right hand pain. (R. 434). Dr. Nashed noted some tenderness over Plaintiff's right thumb with mild swelling. (Id.). Dr. Nashed ordered an X-ray, which revealed mild osteoarthritis. (R. 444). Subsequently, Plaintiff was diagnosed with osteoarthritis of both hands. (See R. 430, 444). Dr. Nashed noted that Plaintiff was prescribed Voltaren for back pain and that the Voltaren was effectively treating Plaintiff's hand pain. (See id.).

### 2. Medical Reports/Opinions

#### a. Physical Residual Functional Capacity Assessment by Atiya M. Lateef, M.D., September 3, 2010

On September 3, 2010, Atiya M. Lateef, M.D., a state agency medical consultant, completed a physical residual functional capacity ("RFC") assessment of Plaintiff, determining that Plaintiff is capable of performing "reduced to light [work] with [certain] . . . limitations." (R. 453-60). Dr. Lateef found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff does possess exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Lateef found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk for approximately six hours in an eight-hour workday, (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 454). Regarding Plaintiff's postural limitations, Dr. Lateef found that Plaintiff is not able to climb ladders, ropes or

scaffolds but is able to occasionally do the following activities: climb ramps or stairs, balance, stoop, kneel, crouch and crawl. (R. 455). Finally, concerning Plaintiff's environmental limitations, Dr. Lateef found that Plaintiff must avoid: moderate exposure to hazards such as machinery and heights and concentrated exposure to extreme cold, vibrations and "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 457). Dr. Lateef found that Plaintiff need not avoid exposure to extreme heat, wetness, humidity or noise. (Id.).

During the physical RFC assessment, Dr. Lateef interviewed Plaintiff regarding the severity of his symptoms and how they affect his daily life. When describing his symptoms, Plaintiff stated that he suffers from constant left leg pain and is unable to bend, lift or stand without experiencing pain. (R. 458). Additionally, Plaintiff stated that he is unable to stand or sit for "very long." (Id.). Despite these complaints, Plaintiff reported that he is able to perform his own personal care, cook, wash dishes, wash laundry, drive, lift up to fifteen pounds and shop for groceries without assistance. (Id.). Dr. Lateef found Plaintiff to be "mostly credible." (Id.). On December 9, 2010, Subhash Gajendragadkar, M.D., reviewed Dr. Lateef's assessment and Plaintiff's medical and non-medical history and stated that he agreed with Dr. Lateef's findings. (R. 461).

### b. Disability Determination Examination by Stephen Nutter, M.D., July 19, 2010

On July 19, 2010, Stephen Nutter, M.D., performed a disability determination examination of Plaintiff, concluding that Plaintiff suffers from chronic cervical and lumbar strain, left-sided lumbar radiculopathy and shortness of breath of unknown origin. (R. 410-14). Prior to the examination, Plaintiff provided a brief history of his medical impairments. (R. 410-11). Plaintiff reported that he suffered from constant back pain of

no known cause, which began around 2003. (R. 410). Plaintiff also reported that he "always" suffered from intermittent neck pain caused by a previous motor vehicle accident. (Id.).

During the examination, Plaintiff presented as alert and oriented with normal intellectual functioning. (See R. 411). Although Plaintiff complained of shortness of breath, Dr. Nutter noted that he did not observe any shortness of breath and that Plaintiff's respirations were even and non-labored. (R. 411, 413). Dr. Nutter further noted that, despite Plaintiff's carpal tunnel syndrome, Plaintiff was able to make a fist with both of his hands, write and pick up coins without difficulty. (R. 412).

Due to Plaintiff's complaints of back and neck pain, Dr. Nutter thoroughly detailed his findings regarding Plaintiff's musculoskeletal system. (See R. 412-13). Dr. Nutter documented that Plaintiff's range of motion of his shoulders was reduced due to back pain and that Plaintiff experienced pain during range of motion testing of his hips, cervical spine and dorsolumbar spine. (R. 412-13). Dr. Nutter further documented that Plaintiff was able to walk with a normal gait without an assistive device, stand on one leg and walk on his heels as well as his toes. (R. 411, 413). Plaintiff could not perform a squat due to back pain. (R. 413). Finally, Dr. Nutter documented that a straight-leg-test revealed a positive result in Plaintiff's left leg in both the sitting and supine positions at fifty degrees. (R. 412). After the examination, Dr. Nutter opined that his "findings [were] not consistent with nerve root compression." (R. 413). Dr. Nutter further opined that Plaintiff had provided "submaximal voluntary effort" at times during the examination. (R. 412, 413).

**C.     Testimonial Evidence**

At the administrative hearing held on June 26, 2013, Plaintiff divulged his relevant personal facts. (R. 126). He was born on July 25, 1969, and was forty-three years of age at the time of the hearing. (R. 132, 133). He is 5'9" tall and his weight fluctuates between 270 and 280 pounds. (R. 133). He is married and lives with his spouse, twenty-two-year-old daughter and three-year-old granddaughter. (Id.).

Plaintiff testified regarding his educational background and prior work experience. Plaintiff quit school after completing the ninth grade and did not obtain any vocational training thereafter. (R. 134-35). Plaintiff is able to read "somewhat," although he has difficulty with "[s]ome of the big words." (Id.). He is also able to write and add and subtract numbers, although he is "not real good at it." (R. 135). Plaintiff's employment history includes working as a glass grinder/packer and a cable wirer. (R. 139). Most recently, Plaintiff worked for Simonton Building Products, Inc., where he "[ran] the saws and screwed the windows together." (R. 137). Plaintiff states that he resigned from this position after he "couldn't do nothing there anymore." (R. 138).

Plaintiff testified that he suffers from several impairments, including back pain, which at times radiates to his left leg or neck. (See R. 141). Plaintiff describes the pain as dull at most times but sharp when he "move[s] real quick or . . . cough[s]." (R. 156). He is prescribed multiple medications to treat the pain, including Neurontin, Lorcet, tizanidine and meloxicam. (R. 142). He states that the medication is effective but "make[s] [him] sleepy." (Id.). Plaintiff, in an attempt to resolve his back pain, underwent back surgery in 2004. (Id.). The surgery, although not entirely successful, provided some relief and allowed Plaintiff to resume working for six years following the surgery.

(R. 142-43). In 2007, Plaintiff had a spinal cord stimulator surgically implanted for a one to two week trial period. (R. 143, 145-47). Although Plaintiff responded well to the stimulator, it was removed after the trial period ended. (R. 147). In 2010, Plaintiff stated that his back "started hurting all over again." (R. 143). However, Plaintiff was informed that there was "[no] point in doing another surgery." (Id.).

Plaintiff testified that he also suffers from respiratory impairments. Plaintiff states that he has asthma, which flares up when exposed to allergies, pollen and cigarette smoke. (See R. 149). Plaintiff further states that he has shortness of breath upon exertion and obstructive sleep apnea, although he does not require a CPAP machine to keep his airway open. (R. 149, 151).

Finally, Plaintiff testified that he suffers from carpal tunnel syndrome and a perirectal abscess. To treat his carpal tunnel syndrome, Plaintiff underwent surgery on both of his upper extremities. (R. 151). While the surgery initially helped, Plaintiff has "difficulty grasp[ing] something for too long." (R. 152). If he grasps an item for too long, his hands become numb and he drops the item. (Id.). As for his perirectal abscess, Plaintiff states that the abscess "still bleed[s]" but should heal on its own without treatment. (R. 141).

Plaintiff described how his impairments affect his day-to-day life. Plaintiff is able to perform his own personal care, although he needs assistance putting on his shoes. (R. 156). Using a cane, he is able to stand for an hour or two and walk for fifty feet. (R. 141, 149). Afterwards, he must lie down for approximately an hour. (R. 141). Sitting is difficult for Plaintiff. (See R. 150). Due to his neuropathy, Plaintiff's left leg must be stretched out when he is sitting. (Id.). He states that "[i]t hurts when I'm sitting, period"

and that he can only do so for up to fifteen minutes or half an hour before needing to lie

down. (Id.). Plaintiff is able to drive for short distances but must stop and stretch for

longer distances. (R. 134, 153). Plaintiff drives to his mailbox every day, which is about

ten minutes from his residence, and into town once a week. (R. 153). Plaintiff's typical

morning consists of waking up at 7:00 A.M., letting the family dog outside and watching

his granddaughter to ensure that she "[doesn't] get in trouble." (R. 153-54). Plaintiff also

helps fold laundry in the morning. (R. 154). In the afternoon, Plaintiff lies down and

watches television. (Id.). He usually lies down in intervals for a total of four to five hours

per day. (Id.).

**D.  Vocational Evidence**

**1. Vocational Testimony**

Larry Bell, an impartial vocational expert, also testified at the administrative

hearing. (R. 126, 157). Mr. Bell characterized Plaintiff's most recent employment

position as a window frame assembler as medium, semi-skilled. (R. 158). As for

Plaintiff's prior work as a cable wirer and a glass grinder/packer, Mr. Bell characterized

the positions as medium, skilled and light, unskilled, respectively. (Id.). Regarding

Plaintiff's ability to return to his prior work, Mr. Bell gave the following responses to the

ALJ's hypothetical:

> Q:      [A]ssum[ing] an individual with the same age, education, and past work
>         experience as the claimant . . . [who] is capable of [performing] light
>         exertional level work [but with the following limitations:]
>
>         [C]an never climb ladders, ropes, or scaffolds. Can occasionally climb
>         ramps or stairs, balance, stoop, crouch -- never kneel, and never crawl.
>         That individual must avoid concentrated exposure to extreme cold,
>         extreme heat, wetness or humidity, excessive vibration. Irritants such as
>         fumes, odors, dust, and gases and all hazards such as -- and must avoid

16

> all hazards such as dangerous moving machinery and unprotected heights.
>
> Can an individual with these limitations perform the claimant's past work?
>
> A:     No, no, [Y]our [H]onor.

(R. 158-59).

Incorporating the above hypothetical, the ALJ then questioned Mr. Bell regarding Plaintiff's ability to perform other work, adding further limitations for Mr. Bell to take into consideration. The additional limitations included: (1) using a cane or other assistive device; (2) frequent overhead reaching with the right arm; (3) frequent handling with both hands; (4) occasional rotation, flexion or extension of the neck; (5) simple, routine and repetitive tasks and (6) taking one to two minutes to change position every half hour. (R. 159-62). Mr. Bell testified that jobs existed at the sedentary, unskilled level that would comply with the ALJ's hypothetical. (R. 161). Such jobs included bench worker and general sorter. (Id.). Mr. Bell testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO"). (R. 162). Plaintiff's attorney chose not to question Mr. Bell when provided the opportunity to do so. (R. 163).

### 2.  Report of Contact Forms, Work History Reports & Disability Reports

On June 5, 2010, Plaintiff completed a work history report. (R. 362). In the report, Plaintiff indicated that he had worked as a laborer for Simonton Windows from 2001 to 2010. (R. 362). Plaintiff described the duties of this position as grinding glassware and cutting glass to assemble window frames. (R. 363, 380). Plaintiff stated that the position required him to frequently lift fifty pounds or more (R. 363) and to stand, walk, stoop, crouch, reach and handle large and small objects for at least ten hours daily. (R. 380).

On September 8, 2010, Steven E. Snow completed a report of contact form opining that Plaintiff is capable of performing light exertional work with postural limitations. (R. 370). Mr. Snow classified Plaintiff's past work as a glass grinder as light exertional work and his work as a cable wirer and window frame assembler as medium exertional work. (Id.). While he found that Plaintiff was incapable of performing his past work, Mr. Snow also found that Plaintiff capable of working as a silver wrapper, stringer and racker. (Id.).

On May 25, 2012, Plaintiff's counsel Katrina Christ, Esq., completed a Disability Report for Plaintiff. (R. 339-40, 348). Ms. Christ indicated that Plaintiff's medical conditions impacting his ability to work consisted of: (1) arthritis; (2) back pain; (3) respiratory problems; (4) neck problems; (5) left leg neuropathy and (6) a pinched nerve. (R. 340). She noted that Plaintiff stopped working on April 22, 2010, "[b]ecause of [his] condition[s]." (Id.). When Plaintiff was interviewed regarding his report via teleclaim, he was noted to have "[h]ad some trouble breathing over the phone." (R. 347).

Plaintiff submitted two Disability Report-Appeal forms. On November 3, 2010, Plaintiff reported a change in his condition. (R. 372). Specifically, Plaintiff reported experiencing a new onset of middle and lower back pain, beginning around July 15, 2010. (Id.). Subsequently, in an undated form, Plaintiff reported the same change in his condition but stated that the pain began in August of 2010. (R. 381). Plaintiff further stated that he could no longer "[lift] anything more than a gallon of milk." (R. 383).

**E.      Lifestyle Evidence**

On June 5, 2010, Plaintiff completed a Personal Pain Questionnaire and an Adult Function Report. (R. 349-61). In the Personal Pain Questionnaire, Plaintiff states that he suffers from pain in his "lower back, leg, and foot." (R. 349). Plaintiff characterizes the pain as continuous and aching, burning, stabbing and throbbing in nature. (R. 349-52). Plaintiff states that the pain becomes so severe at times that he is unable to walk or stand and that bending, lifting and standing worsen the pain. (R. 349). Plaintiff reports that he takes naproxen, tizanidine and hydrocodone for the pain. (R. 350-52). Plaintiff describes his medication as "sometimes" effective but states that it causes drowsiness. (Id.). Plaintiff further states that, in addition to medication, lying on his stomach alleviates the pain. (R. 349, 351-52).

In the Adult Function Report, Plaintiff states that he suffers from constant back pain that sometimes radiates to his groin, left leg and left foot. (R. 354, 359). He describes his typical morning as letting the family dog outside and caring for a pet bird, although his wife and daughter assist with all pet care. (R. 355). He estimates that he goes outside three to four times a day. (R. 357). As needed throughout the day, he soaks in hot water to help with his pain. (R. 355). At night, he sleeps on this stomach because he "can't lay on [his] back [or side]" for an extended period of time. (Id.). Plaintiff's daily medications, which he states make him drowsy and dizzy, include hydrocodone, Proventil HFA, tizanidine, naproxen and meloxicam. (R. 361).

Plaintiff explains how he is physically limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. (See R. 355-57). For example, Plaintiff performs his own personal care, requiring assistance only to put on

his socks and shoes. (R. 355). Plaintiff also is able to perform various household chores, including washing laundry, washing dishes and cooking, although he will occasionally require assistance if his pain worsens. (R. 356). Plaintiff has no issues handling money and is able to pay bills, count change, handle a savings account and use a checkbook without difficulty. (R. 357). He is also able to drive a vehicle, leave the house without accompaniment and go grocery shopping. (Id.).

While Plaintiff is able to perform some activities, others prove more difficult. For example, Plaintiff can no longer perform certain hobbies, such as dancing, riding dirt bikes or working on his car. (R. 355). Additionally, he can no longer mow the grass, although he states that he tries to do what yard work he can. (R. 355, 357). Although never prescribed by a physician, Plaintiff uses a cane while walking to reduce his pain. (R. 360). With a cane, he is able to walk 75 to 100 feet before stopping and resting, although he is able to resume walking after a five minute rest. (R. 359). Plaintiff also states that his pain prevents him from lifting items heavier than fifteen pounds. (Id.).

As for his mental abilities, Plaintiff states that he is able to follow written and spoken instructions, socialize well with others and handle stress. (R. 359-60). While he does "not know" how long he can pay attention, he is able to follow through and complete tasks. (R. 359). He denies handling changes to his routine well. (R. 360).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy, regardless of whether
such work exists in the immediate area in which he lives, or whether a
specific job vacancy exists for him, or whether he would be hired if he
applied for work. . . . '[W]ork which exists in the national economy' means
work which exists in significant numbers either in the region where such
individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following

five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing
substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your
impairment(s). If you do not have a severe medically determinable physical
or mental impairment that meets the duration requirement . . . or a
combination of impairments that is severe and meets the duration
requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your
impairments(s). If you have an impairment(s) that meets or equals one of
our listings . . . and meets the duration requirement, we will find that you
are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all
the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your
past relevant work. If you can still do your past relevant work, we will find
that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and
your age, education, and work experience to see if you can make an
adjustment to other work. If you can make an adjustment to other work, we
will find that you are not disabled. If you cannot make an adjustment to
other work, we will find that you are not disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four,

the burden is on the claimant to prove that he or she is disabled and that, as a result of

the disability, he or she is unable to engage in any gainful employment. Richardson v.

Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof

shifts to the Government during step five to demonstrate that jobs exist in the national

economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299,

301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of

the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520

(2015); 20 C.F.R. § 416.920 (2012).

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ

found that:

1.    The claimant meets the insured status requirements of the Social
Security Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since
April 23, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative
disc disease of the cervical, thoracic, and lumbosacral spine status
post laminectomy of the lumbar spine in 2004; history of asthma;
and obesity (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of
impairments that meets or medically equals the severity of one of
the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
(20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned
finds that the claimant has the [RFC] to perform a range of
sedentary work as defined in 20 CFR 404.1567(a) subject to some
additional nonexertional limitations. More specifically, the claimant
is able to frequently reach overhead with his right arm and handle
bilaterally, but can only occasionally rotate/flex/extend his neck,
climb ramps/stairs, balance, stoop, and crouch. He cannot climb
ladders/ropes/scaffolds, kneel, or crawl and must avoid
concentrated exposure to extreme cold, extreme heat, wetness or
humidity, excessive vibrations, irritants such as fumes/odors/dusts/
gases, and hazards such as moving machinery and unprotected
heights. Also, he must be afforded the opportunity for brief 1 to 2
minute changes of position at intervals not to exceed 30 minutes
without being off task and the job must accommodate the use of a

cane or other assistive device for ambulation or balance. Finally, he is capable of performing simple, routine, and repetitive tasks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on July 25, 1969 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2010, through the date of this decision (20 CFR 404.1520(g)).

(R. 68-75).

## VI.    THE MOTIONS FOR SUMMARY JUDGMENT

### A.    Contentions of the Parties

Plaintiff raises three issues in his Motion for Summary Judgment. (Pl.'s Br. at 9). Specifically, Plaintiff asserts that the ALJ erred: (1) in assessing Plaintiff's credibility; (2) by failing to call upon a qualified psychiatrist or psychologist to complete a Psychiatric Review Technique Form and (3) by failing to sufficiently consider Plaintiff's mental limitations when proposing hypothetical questions to the vocational expert. (Id.). Plaintiff

contends that the ALJ's errors warrant reversal of the Commissioner's decision. (<u>See</u> <u>id.</u> at 15).

In her Motion for Summary Judgment, Defendant asserts that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant asserts that: (1) substantial evidence supports the ALJ's credibility finding; (2) Plaintiff did not demonstrate that an anxiety disorder significantly limited his ability to perform basic work activities and (3) the ALJ's hypothetical question to the vocational expert was appropriate. (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 11-14, ECF No. 14). Defendant requests that the Court affirm the Commissioner's decision. (<u>See</u> <u>id.</u> at 15).

**B.    Scope of Review**

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). However, "it is not within the province of a reviewing court to determine the

weight of the evidence, nor is it the court's function to substitute its judgment . . . if [the] decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**C.     Analysis of the Administrative Law Judge's Decision**

**1.   Whether the ALJ Erred in Determining Plaintiff's Credibility**

Plaintiff raises two issues regarding the ALJ's credibility determination. First, Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 9). Second, Plaintiff argues that the ALJ did not include all of Plaintiff's physical limitations in her hypothetical question to the vocational expert. (Id. at 10).

**a.     Whether the ALJ's Credibility Determination is Supported by Substantial Evidence**

Plaintiff asserts that the ALJ's determination that Plaintiff is "not entirely credible" is not supported by substantial evidence because the ALJ "[misunderstood] . . . the record and the medical evidence." (Pl.'s Br. at 11). Alternatively, Defendant contends that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. (Def.'s Br. at 11). Defendant explains that the ALJ outlined, *inter alia*, the medical treatment required to treat Plaintiff's pain, discrepancies between Plaintiff's assertions and information contained in documentary reports, Plaintiff's medical history and reports of reviewing, treating and examining physicians. (Id.).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out several factors for an ALJ to use when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D.

W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. <u>Shively</u>, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." <u>Ryan v. Astrue</u>, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" <u>Sencindiver v. Astrue</u>, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 72). First, the ALJ determined that Plaintiff had proved that he suffers from severe medical impairments capable of causing the symptoms alleged (R. 70-72), including: "degenerative disc disease of the cervical, thoracic, and lumbosacral spine . . . [,] history of asthma, and obesity." (R. 68). The ALJ further considered Plaintiff's perirectal abscess and carpal tunnel syndrome, although she determined that these impairments are not severe in nature. (R. 69). Second, the ALJ examined the factors outlined in SSR 96-7p when assessing the credibility of Plaintiff's subjective allegations in light of the entire record. (<u>See</u> R. 70-73).

### i.    Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making her credibility determination. The ALJ noted that Plaintiff "get[s] up around 7 [A.M.], sit[s] on his porch, help[s] his daughter take care of his granddaughter [and] tak[es] care of miscellaneous light household chores, such as laundry, preparing lunch, etc." (R. 70). The ALJ further noted that Plaintiff "watch[es] television, and lay[s] around in the afternoon." (Id.).

### ii.    Plaintiff's Pain and Other Symptoms

The ALJ also discussed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's pain, the ALJ noted that Plaintiff suffers from "generalized pain located in his neck, whole back, and legs." (Id.). As for his other symptoms, the ALJ noted that Plaintiff occasionally experiences shortness of breath. (Id.).

Regarding factors that aggravate Plaintiff's symptoms, the ALJ documented that physical activity worsens Plaintiff's pain. (See id.). For example, the ALJ noted that Plaintiff "can only sit for brief periods of time, stand for [one] hour [and] walk [fifty] feet." (Id.). The ALJ further noted that cigarette smoke and pollen exacerbate Plaintiff's breathing problems. (Id.).

### iii.    Plaintiff's Pain Medication

The ALJ examined the medication that Plaintiff is prescribed for his pain (factor four). The ALJ emphasized that Plaintiff's "only current treatment for his pain complaints involves taking medication." (Id.). The ALJ listed Plaintiff's medications as "Neurontin,

Loracet [sic] and Meloxicam." (Id.).

### iv.  Other Treatment and Measures Used to Relieve Pain

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for pain relief (factor five) as well as measures Plaintiff uses to relieve pain on his own (factor six). Regarding treatment other than medication that Plaintiff has received for his pain, the ALJ highlighted several facts. First, the ALJ noted that Plaintiff underwent back surgery in 2004 and a one-week trial of a spinal cord stimulator in 2007 to treat his pain. (R. 72). Second, the ALJ noted that an orthopedist at the WVUH Spine Center recommended only conservative treatment for Plaintiff's current complaints of pain. (Id.). Third, the ALJ noted that, other than the recommended conservative treatment, Plaintiff "has not received any other form of treatment for pain such as . . . biofeedback, a morphine pump, acupuncture, massage therapy, chiropractic adjustments, or ongoing pain management since his alleged onset date in 2010." (R. 73). Finally, the ALJ noted that no physician placed any "restrictions . . . on [Plaintiff] . . . since his alleged onset date. (R. 73). As for measures Plaintiff uses to relieve pain on his own, the ALJ noted that Plaintiff uses a cane and attempts to limit his physical activity. (See R. 70).

### v.  Plaintiff's Work History and MRI Results

Two additional factors that the ALJ considered when assessing Plaintiff's credibility are his work history and his 2009 and 2012 MRI results. Specifically, the ALJ noted that a comparison of the lumbar portions of Plaintiff's 2009 and 2012 MRIs showed that "no significant deterioration in [Plaintiff's] spinal condition" had occurred within this time period. (R. 73). The ALJ further noted that if no significant deterioration

had occurred and Plaintiff's symptoms were not so severe as to prevent him from working in 2009, then Plaintiff's symptoms should not prevent him from working now. (Id.). Plaintiff argues that the ALJ erred when drawing this conclusion, contending that the MRIs show significant deterioration. (Pl.'s Br. at 11). Defendant counters that the results of the 2012 MRI specifically report that the lumbar sections of the two MRIs produced similar findings. (Def.'s Br. at 12).

The undersigned finds that the ALJ's conclusion that the lumbar portions of the two MRIs show no significant deterioration is supported by the record. While the results of the two MRIs use different language and descriptions, the findings of the 2012 MRI specifically state that they "are similar as compared to the prior study of August 31, 2009." (R. 528). Accordingly, the ALJ did not err in considering Plaintiff's MRI results or his work history in her credibility determination.

### vi.    Plaintiff's Failure to Follow Recommended[2] Treatment

Finally, the ALJ considered Plaintiff's non-compliance with his treatment recommendations when making her credibility determination. The ALJ noted that several physicians had advised Plaintiff "to lose weight, stop smoking cigarettes, and/or go to physical therapy." (R. 73). After further noting that Plaintiff had failed to comply with any of these recommendations, the ALJ concluded that Plaintiff's non-compliance "at least suggests that [Plaintiff's symptoms are] not as severe as he has asserted."

---

[2] The Fourth Circuit has noted that the Seventh Circuit "makes a distinction between 'recommended' and 'prescribed' treatment." Gordon v. Schweiker, 725 F.2d 231, 237 n.2 (4th Cir. 1984) (quoting Cassiday v. Schweiker, 663 F.2d 745, 750 (7th Cir. 1981)). While a claimant may be denied DIB for failing to comply with *prescribed* treatment, a claimant may not be denied DIB solely for failing to follow *recommended* treatment. See id. The Fourth Circuit has not yet adopted this distinction. See id. Nevertheless, an ALJ may indisputably consider a claimant's failure to follow his or her treatment recommendations as one factor in a credibility assessment. See id.; Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *35-36 (N.D. W. Va. June 16, 2015).

(Id.). Plaintiff argues that the ALJ erred when considering Plaintiff's noncompliance, contending that: (1) obesity is a life-long disease; (2) Plaintiff chews tobacco and does not smoke and (3) Plaintiff could not attend physical therapy sessions due to the cost of gas. (Pl.'s Br. at 11-12). Defendant argues that the record supports the ALJ's determination that Plaintiff failed to follow his treatment recommendations. (Def.'s Br. at 12-13).

A claimant's failure to comply with recommended treatment may be used to support an inference that a claimant's symptoms are not as severe as asserted. See Gordon v. Schweiker, 725 F.2d 231, 237 n.2 (4th Cir. 1984); see also Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir. 1992). While rarely used to deny DIB to a claimant, noncompliance with recommended treatment may be used as one factor when considering the claimant's credibility. See Horvath v. Massanari, 20 F. App'x. 222, 223 (4th Cir. 2001); Pearson v. Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *35-36 (N.D. W. Va. June 16, 2015). However, failure to seek treatment due to a lack of funds may not be used as a factor in a credibility determination. Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir. 1984).

In the present case, the undersigned finds that the ALJ did not err in considering Plaintiff's failure to lose weight or quit smoking cigarettes as factors in her credibility determination. Regarding Plaintiff's failure to lose weight, Plaintiff does not contest that he is obese and that he failed to lose weight. While the undersigned understands that obesity is a lifelong disease, Plaintiff's non-compliance with weight loss recommendations may nevertheless be used as one factor in an ALJ's credibility determination. As for Plaintiff's smoking status, multiple documents in the record report

that Plaintiff smoked cigarettes and was told to quit. (<u>See, e.g.</u>, R. 436, 445, 464). However, even if Plaintiff does not smoke cigarettes and instead chews tobacco, Plaintiff was advised by Dr. Nashed to cease chewing tobacco. (R. 436). Therefore, whether Plaintiff failed to stop smoking cigarettes or failed to stop chewing tobacco, Plaintiff's non-compliance was a proper factor for consideration in a credibility determination.

While the ALJ did not err in considering the above two factors, the undersigned finds that the ALJ erred in considering Plaintiff's failure to attend physical therapy sessions. The record shows that Plaintiff refused his most recent physical therapy consultation "due to the [cost of] gas," a fact which is uncontested in the record. (R. 635). Consequently, Plaintiff's failure to attend physical therapy sessions should not have been held against him. This error, however, was harmless in nature. The ALJ's decision as a whole demonstrates that Plaintiff was not denied DIB solely because of his failure to comply with his physicians' treatment recommendations. Instead, the ALJ considered Plaintiff's noncompliance as only one factor among many. Accordingly, the undersigned finds that the ALJ's reference to Plaintiff's noncompliance does not render the ALJ's otherwise thorough and well-reasoned credibility determination improper.

### vii. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear her reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed

to meet this burden. Consequently, the undersigned accords the ALJ's credibility

determination the great weight to which it is entitled.

**b.     Whether the ALJ Provided a Proper Hypothetical Question to the Vocational Expert**

Plaintiff contends that the ALJ's "hypothetical question to the vocational expert

was not valid because it did not include all of [Plaintiff's physical] limitations." (Pl.'s Br. at

10). Specifically, Plaintiff contends that the ALJ failed to include the following:

> Plaintiff testified that [L]orcet given to him for back pain caused him to be sleepy. He indicated that cigarette smoke made it impossible for him to breathe. Pollen caused him to stay in the house and he had trouble breathing outside in the heat. He could only walk for [fifty] feet at most. He could stand for an hour at most and had difficulty sitting more than [fifteen] to [thirty] minutes. When he did sit, he kept his left leg stretched out. Lastly, his hands hurt. He has difficulty with dropping things and suffers from numbness. He indicated that he lies down to rest four to five hours per day. He described his day as being up for an hour and sitting, then go [sic] back and lie down for an hour.

(Pl.'s Br. at 10). Defendant argues that the ALJ included all of Plaintiff's credible

limitations in her hypothetical question and properly excluded the limitations she

deemed not credible. (Def.'s Br. at 13).

An ALJ poses hypothetical questions to a vocational expert to determine whether

work is available in the national economy that the claimant is capable of performing.

Farnsworth v. Astrue, 604 F. Supp. 2d 828, 837 (N.D. W. Va. 2009). Hypothetical

questions are relevant only if they "*fairly* set out all of [a] claimant's impairments." Fisher

v. Barnhart, 181 F. App'x 359, 364 (4th Cir. 2006) (emphasis in original). A hypothetical

question is fair if it informs the vocational expert of what the claimant's abilities and

limitations are, even if every limitation is not listed. Farnsworth, 604 F. Supp. 2d at 853,

858. An ALJ need only list the limitations he or she finds credible in the hypothetical

question. See id.

In the present case, the undersigned finds that the ALJ provided a proper

hypothetical question to the vocational expert. The ALJ posed the following hypothetical

to the vocational expert:

> [A]ssume an individual with the same age, education, and past work experience as the claimant . . . [who] is capable of [performing] light exertional level work [but with the following limitations:]
>
> [C]an never climb ladders, ropes, or scaffolds. Can occasionally climb ramps or stairs, balance, stoop, crouch -- never kneel, and never crawl. That individual must avoid concentrated exposure to extreme cold, extreme heat, wetness or humidity, excessive vibration. Irritants such as fumes, odors, dust, and gases and all hazards such as -- and must avoid all hazards such as dangerous moving machinery and unprotected heights.

(R. 158-59). In a second hypothetical, the ALJ added more limitations. (R. 159-62).

These additional limitations included: (1) using a cane or other assistive device; (2)

frequent overhead reaching with the right arm; (3) frequent handling with both hands;

(4) occasional rotation, flexion or extension of the neck; (5) simple, routine and

repetitive tasks and (6) taking one to two minutes to change position every half hour.

(Id.). These detailed hypothetical questions fairly set out all of Plaintiff's impairments

and served their purpose of informing the vocational expert of what Plaintiff's limitations

and abilities are. While the ALJ included only the "symptoms [and limitations]" that she

found credible (R. 70) and did not list every limitation that Plaintiff claimed to have, she

was not required to do so.[3] Moreover, Plaintiff has not shown that the inclusion of more

limitations would have resulted in a different outcome. Consequently, the hypothetical

questions posed to the vocational expert constitute a sufficient basis for determining

---

[3] See Part VI.C.1.a.vii (finding that the ALJ's credibility determination is supported by substantial evidence).

that work exists in the national economy that Plaintiff is capable of performing.

### 2. Whether the ALJ Erred by Failing to Call Upon a Qualified Psychiatrist or Psychologist to Complete a Psychiatric Review Technique Form

Plaintiff contends that he suffers from an anxiety disorder and that the ALJ erred by failing to call upon a qualified psychologist or psychiatrist to complete a Psychiatric Review Technique Form ("PRTF"). (Pl.'s Br. at 13-14). Defendant counters that Plaintiff's counsel should have raised the issue of a mental impairment at the administrative hearing and that Plaintiff's anxiety disorder is not a current impairment. (Def.'s Br. at 14). Plaintiff responds by arguing that the ALJ had a duty to develop the record and failed to inquire into Plaintiff's anxiety disorder. (Pl.'s Br. in Reply to Def.'s Br. in Supp. of Mot. For Summ. J. at 3).

If a disability claim is based on a mental impairment, then the ALJ must make "every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review." 42 U.S.C. § 421(h) (2004). After reviewing the case, the qualified psychiatrist or psychologist completes a PRTF to aid the ALJ in his or her evaluation of the disability claim. See White v. Barnhart, 321 F. Supp. 2d 800, 804 (N.D. W. Va. 2004). Initially, the claimant has the burden of proving the existence of a mental impairment by furnishing medical records or other evidence. King v. Herbert J. Thomas Mem'l Hosp.,159 F.3d 192, 197 (4th Cir. 1998). Once this burden is met, the ALJ "has a duty to explore all relevant facts and [to] inquire into the issues necessary for adequate development of the record." Cook v. Heckler. 783 F.2d 1168, 1171 (4th Cir. 1986). Therefore, if the claimant furnishes inadequate or incomplete medical records, the ALJ must seek additional records or clarification from the claimant's treating physicians. Farnsworth, 604 F. Supp. 2d at 834, 857. If the ALJ

35

fails to fully develop the record, the claimant must show that he or she "was prejudiced by the inadequate record." Id. at 855 (quoting Hyde v. Astrue, 2008 U.S.App. LEXIS 10228 (5th Cir.)). Prejudice exists "where the Commissioner's decision 'might reasonably have been different had the evidence been before [the ALJ] when the decision was rendered.'" Id. (quoting King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)). Once prejudice is shown, remand is necessary. Id.

In the present case, the undersigned finds that the ALJ was not required to have a qualified psychiatrist or psychologist complete a PRTF because Plaintiff did not meet his burden of proving the existence of a current mental impairment for several reasons. First, Plaintiff seemingly does not consider himself as suffering from a mental impairment. Plaintiff did not assert that he suffers from a mental impairment in his application for DIB, including in the various Disability Reports and in his Adult Function Report. Moreover, although Plaintiff was represented by counsel at both administrative hearings, no mention of a mental impairment was made at either hearing. Instead, upon seeking judicial review of the Commissioner's decision, Plaintiff is for the first time asserting that he suffers from a mental impairment.

Second, any anxiety that Plaintiff may have experienced in the past appears resolved.[4] The only documented instance of Plaintiff experiencing anxiety in the record appears on a June 8, 2009 treatment note, written before Plaintiff's date of onset, when Dr. Nashed noted that Plaintiff appeared "quite anxious." (R. 431). Since then, Plaintiff does not appear to have complained of anxiety. (See R. 132-54). While Plaintiff disclosed in his Adult Function Report that he does not handle changes in his routine

---

[4] The Fourth Circuit, albeit in an unpublished opinion, has held that that an ALJ "was not required to complete a PRTF" when a plaintiff has only a history of a mental impairment. Byrd v. Apfel, No. 98-1781, 1998 WL 911718, at *3 (4th Cir. 1998).

36

well, he also reported that he handles stress "all right [sic]." (R. 359-60). Furthermore, while Dr. Nashed prescribed Xanax to Plaintiff after noting that he appeared anxious, a prescription that was later changed to citalopram, no further action was taken regarding Plaintiff's anxiety. (See R. 431, 706). For example, Plaintiff was not referred to a psychologist or psychiatrist or scheduled for any follow-up care.

Because Plaintiff did not meet his burden of proving that he suffers from a current mental impairment, the burden never shifted to the ALJ to more fully develop the record regarding Plaintiff's anxiety. However, even if the ALJ had sought to more fully develop the record, Plaintiff has not shown that additional, relevant medical records exist that may have altered the ALJ's decision. Consequently, Plaintiff is unable to show that he was prejudiced by the ALJ's actions and remand is unnecessary.

### 3. Whether the Hypothetical Question the ALJ posed to the Vocational Expert was Legally Insufficient for Failing to Address Plaintiff's Mental Limitations

Plaintiff contends that the ALJ failed to sufficiently address Plaintiff's mental limitations when she stated that Plaintiff could perform "simple, routine, and repetitive tasks." (Pl.'s Br. at 15). Specifically, Plaintiff contends that the ALJ failed to address Plaintiff's mental limitations "with regard to concentration and attention." (Pl.'s Br. at 14). Defendant argues that Plaintiff failed to prove any specific mental limitations such as difficulty with concentration, persistence or pace. (Def.'s Br. at 14).

The "ultimate responsibility for determining a claimant's [mental limitations] is reserved for the ALJ, as the finder of fact." 20 C.F.R. § 416.946 (2011). Hypothetical questions posed to the vocational expert must fairly set out all of the claimant's severe impairments that are supported by the record. Farnsworth, 604 F. Supp. 2d at 852-53,

858. Non-severe impairments may be omitted. Id. at 858. If the claimant faces mental limitations caused by a severe impairment, then the hypothetical question must properly illustrate those limitations. See Mascio v. Colvin, 780 F.3d 632, 637-38 (4th Cir. 2015). Boilerplate language that restricts the hypothetical question to "simple, routine tasks or unskilled work" is insufficient to illustrate limitations in concentration, persistence and pace because "the ability to perform simple tasks differs from the ability to stay [focused]." Id. at 638.

In the present case, the undersigned finds that the ALJ properly described Plaintiff's mental limitations and presented a sufficient hypothetical question to the vocational expert. As previously discussed in Part VI.C.2, Plaintiff has not established that he suffers from a severe mental impairment that was required to be set out in the hypothetical question. Instead, the ALJ's determination that Plaintiff could perform "simple, routine, and repetitive tasks" (R. 70) fairly set out Plaintiff's established mental limitations. While Plaintiff contends that he suffers from difficulty concentrating and staying focused, these contentions are not supported by the record. While Plaintiff reported in his Adult Function Report that he does "not know" how long he can pay attention, he also reported that he is able to complete tasks and to follow written and spoken instructions. (R. 359-60). Furthermore, Plaintiff's reviewing, treating and examining physicians have not documented that Plaintiff experiences difficulty concentrating or staying focused. Because these contentions are unsupported, the ALJ was not required to present them to the vocational expert in her hypothetical question.

**D.  Plaintiff's Motion to Proffer Evidence**

The next issue before the Court is whether a June 28, 2013 treatment note,

written by Dr. Nashed and reporting that Plaintiff chews tobacco but does not smoke cigarettes, constitutes new and material evidence requiring remand. (See Mot. for Remand at 1, ECF No. 16). Plaintiff argues that "Dr. Nashed's report [either] shows that [Plaintiff] had quit smoking as of the date of hearing . . . or had never smoked." (Mem. in Supp. of Mot. for Remand at 3, ECF No. 16-1). Plaintiff further argues that, because the ALJ determined that Plaintiff failed to comply with recommendations to quit smoking cigarettes, the ALJ's decision cannot be supported by substantial evidence because she "[relied] on an erroneous assumption." Id.

Defendant counters Plaintiff's arguments by contending that Dr. Nashed's June 28, 2013 treatment note is not material and that no good cause for remand exists. (Def.'s Resp. to Pl.'s Mem. in Supp. of Mot. for Remand at 2, 4, ECF No. 21). Defendant contends that the treatment note is not material because it is cumulative of evidence already in the record and considered by the ALJ. (Id. at 2). Defendant contends that no good cause for remand exists because "no legally-sufficient reason [exists regarding] why this evidence was not presented to the ALJ during the hearing." (Id. at 5). Defendant declares that "if Plaintiff's counsel truly believed that Plaintiff's progress notes . . . were incorrect in recording that Plaintiff needed to quit smoking, the onus was on Plaintiff's counsel to raise the issue at the appropriate time, during the administrative hearing." (Id. at 5).

If a claimant presents evidence that has not been submitted to the ALJ, then the evidence may be considered only for the limited purpose of determining whether a sentence-six remand should be granted pursuant to Section 405(g) of the Social Security Act. See 42 U.S.C. § 405(g) (2010). Under Section 405(g):

> A reviewing court may remand a Social Security case to the Secretary on the basis of newly discovered evidence if four prerequisites are met. The evidence must be relevant to the determination of disability at the time the application was first filed and not merely [duplicative or] cumulative. It must be material to the extent that the Secretary's decision might reasonably have been different had the new evidence been before her. There must be good cause for the claimant's failure to submit the evidence when the claim was before the Secretary, and the claimant must present to the remanding court at least a general showing of the nature of the new evidence.

Wilkins v. Sec'y, Dep't. of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991);

Wajler v. Colvin, No. 13CV156, 2014 WL 4681759, at *10 (N.D. W. Va. Sept. 19, 2014).

In determining whether to grant a sentence-six remand, a court only considers the new evidence that has come to light and does not "rule in any way as to the correctness of the administrative decision." Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991).

In the present case, the undersigned finds that Plaintiff has failed to prove the four prerequisites for a sentence-six remand. While Plaintiff has presented a general showing of the nature of the new evidence and has good cause for failing to submit the evidence at an earlier time,[5] the treatment note is not new or material. The treatment note is not new because multiple documents in the record already report that Plaintiff chews tobacco but does not smoke cigarettes. (See, e.g., R. 441, 445, 670-72, 706). Furthermore, it is not material because no reasonable possibility exists that the ALJ would have altered her decision after considering the treatment note. As previously discussed in Part VI.C.1.vi, the ALJ partly based her determination that Plaintiff is not entirely credible on the fact that he has not complied with his physicians' recommendations to quit smoking cigarettes. (R. 73). However, even if Plaintiff does not smoke cigarettes and instead chews tobacco, Plaintiff was advised by Dr. Nashed to

---

[5] The treatment note is dated June 28, 2013, two days after the administrative hearing. Therefore, Plaintiff could not have submitted this evidence to the ALJ.

quit chewing tobacco. (R. 436). Whether Plaintiff failed to quit smoking cigarettes or failed to quit chewing tobacco is thus irrelevant and would not have changed the outcome. Consequently, the undersigned finds that a sentence-six remand is not warranted.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED** and the decision of the Commissioner be affirmed. I further **RECOMMEND** that Plaintiff's Motion for Remand for Consideration of New and Material Evidence (ECF No. 16) be **DENIED** and that this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in a waiver of the right to appeal from a judgment of this Court based upon this Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 9th day of September, 2015.


ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE